(November 23, 1993)

■ ADELAIDE ABREU, Appellant, v FRANCIS P. FERRER, JR., as Preliminary Executor of FRANCIS P. FERRER, Deceased, Respondent. [603 NYS2d 485] —Order of the Supreme Court, New York County (Francis Pecora, J.), entered on October 31, 1991 which denied plaintiff's motion to set aside the judgment, unanimously reversed, on the law, the facts, and in the exercise of discretion, and the matter remanded for a new trial, limited to the issues of causation and damages, with costs to abide the event.

Appeal from the judgment of the Supreme Court, New York County (Francis Pecora, J.), entered on November 29, 1991, which, after a jury trial, dismissed the action, dismissed as moot, without costs.

In this medical malpractice action, because of both the egregiousness of the malpractice and the fundamental nature of the error, we are taking the extraordinary step of reversing a jury finding of no proximate injury, in the exercise of our discretion, on the basis of a palpably erroneous jury charge as to which no objection was made.

The jury found in response to interrogatories that Dr. Ferrer had committed malpractice in connection with his treatment of plaintiff, but found that the malpractice was not the proximate cause of any injury to plaintiff. There is no question that the jury's finding of malpractice is well supported by the evidence. Indeed it is unassailable; for the magnitude and degree of Dr. Ferrer's dereliction in the treatment of the plaintiff was extreme. However, the finding that the plaintiff suffered no proximate injury, appears to be the result of an incorrect charge to the jury, which instructed, in essence, that damages could only be awarded on the theory that, but for the doctor's negligence, plaintiff would have led "a normal life." Plainly, this is not the standard.

The plaintiff became a patient of Dr. Francis P. Ferrer in 1969 when she was 32 years of age. She was at the time employed in the fashion industry as a designer. Dr. Ferrer, now deceased, was a practitioner, albeit without specialty certification, of internal medicine. The plaintiff reported to Dr. Ferrer that she suffered from insomnia and "weak attacks".

Without performing any diagnostic tests, Dr. Ferrer attributed plaintiff's condition to a menstrually related pituitary-adrenal imbalance. He thereupon commenced a bizarre course of drug and megavitamin therapy including dozens of different prescriptions. On her first visit to defendant, plaintiff was prescribed a combination of estrogen, Abdee, Cytomel, Metahydrin, Ritalin, Wyamine, Dentil, Organidin, Phrenilin, and several vitamins. This combination had to be put together by a pharmacist as it was not available from any manufacturer of pharmaceuticals.

Thereafter, plaintiff regularly visited Dr. Ferrer. At different times over the 12 years that Dr. Ferrer treated plaintiff, he prescribed the following medicines, in varying combinations and often in non-therapeutic dosages: Serax (addictive, indicated for psychoneurotic personality disorders); Placidyl (a psychological dependency inducing hypnotic); Ritalin (a stimulant which can cause insomnia); Ornade (a decongestant that can produce insomnia); Letan (a thyroid hormone); Fiorinal (a pain killer); Triavil (for psychosis and neuroses); Lasix (a diuretic); and cortisone (a steroidal hormone).

The record indicates that the bulk of Dr. Ferrer's practice involved women who were treated with similar prescriptions, what plaintiff's counsel aptly characterized as "menstrual medicine." When plaintiff came to see the doctor before her period, he gave her injections of progesterone; when she came to see him after her period, he gave her injections of testosterone. Additionally, Dr. Ferrer prescribed Quaaludes, a powerful and highly addictive sleeping medication that has since been banned. It was alleged that Dr. Ferrer prescribed both amphetamines and sleeping pills at the same time. According to plaintiff, Dr. Ferrer told her she would get better as soon as her "glands healed."

In 1981, plaintiff was referred by her union to Dr. David Weiner. Although also an internist, Dr. Weiner recognized, upon hearing the plaintiff complain of seeing nonexistent bugs and of fearing that people were trying to kill her, that she suffered, at least in significant part, from a psychiatric disorder. Dr. Weiner proceeded to treat the plaintiff with antipsychotic agents in therapeutic dosages and with lithium, a well-regarded treatment for manic-depressive illness. Thereafter, plaintiff's condition and general well-being improved.

The jury, in response to specific interrogatories, found, as had a unanimous medical malpractice panel, that Dr. Ferrer had engaged in malpractice, but found that such malpractice

did not proximately cause plaintiff's injuries. We affirm the finding of malpractice but reverse the finding that plaintiff sustained no injury by reason thereof.

In its charge to the jury, the court gave the following instruction on causation: "To state it another way, an act or omission is the proximate cause of an injury if it has such an effect on producing the injury that reasonable men would regard it as the cause of the injury. Plaintiff claims that when she went to Dr. Ferrer she had certain psychological and psychiatric problems. Plaintiff further claims that if Dr. Ferrer had treated her properly and prescribed the proper medication, she would have been able to lead a normal life. Instead, due to Dr. Ferrer's negligence, her condition did not improve and she could not lead a normal life. Accordingly, the plaintiff claims that defendant Dr. Ferrer's negligence was a proximate cause of the plaintiff's injuries."

Contrary to this charge, the issue for the jury was not whether the plaintiff was deprived of the ability to "lead a normal life" as a result of Dr. Ferrer's malpractice. Rather, the question for the jury should have been whether the plaintiff suffered legally cognizable injury proximately caused by the doctor's failure competently to diagnose and treat her over a period of some 12 years. Recovery for medical malpractice, or any other form of negligence, is not predicated upon a plaintiff's underlying capacity for a "normal life". The error in the charge, although not preserved as a matter of law, was so basic and prejudicial to any prospect the plaintiff may have had to recover for the malpractice to which she had been subject for more than a decade, as to fully justify exercise of our discretion (see, Petryszyn v Di Fulvio, 185 AD2d 405).

Were we not reversing on the basis of the erroneous jury charge, we would reverse on the ground that the verdict on causation was against the weight of the evidence (see, Shaw v Manufacturer's Hanover Trust Co., 95 AD2d 738). Concur—Murphy, P. J., Carro, Rosenberger and Ross, JJ.